**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| 1001 WL, LLC | § | |
| | § | Case No. 24-10119-SMR |
| _____Debtor._____ | § | |
| | § | |
| XAVIER EDUCATIONAL ACADEMY, | § | |
| LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. _____ |
| | § | |
| 1001 WL, LLC and GALLERIA LOOP | § | |
| NOTE HOLDER, LLC, | § | |
| | § | |
| Defendants. | § | |

**XAVIER'S ORIGINAL ADVERSARY COMPLAINT AND**
**EMERGENCY REQUEST FOR TEMPORARY RESTRAINING ORDER**

TO THE HONORABLE SHAD ROBINSON, UNITED STATES BANKRUPTCY JUDGE:

Xavier Educational Academy, LLC ("Xavier" and "Tenant") files this *Xavier's Original Adversary Complaint and Emergency Request for Temporary Restraining Order* (the "Complaint") and respectfully pleads as follows:

**I.**
**INTRODUCTION**

1.     Xavier is a college preparatory school in Houston catering to middle and high school students. On or about May 7, 2021, Xavier and Galleria Loop Note Holder, LLC ("GLNH" and "Landlord") entered into a Lease Agreement (the "Lease") for real property located at 1001 West Loop South, Houston, Texas (the "Premises"). As part of the Lease, GLNH agreed to reimburse Xavier for amounts Xavier spent on leasehold improvements to the 3rd Floor Premises

defined as "Tenant Improvements" under the Lease. Consistent with the Lease terms, Xavier began making substantial Tenant Improvements on August 16, 2021. In the meantime, Xavier began occupying temporary space on the 5th Floor pursuant to a series of short term occupancy agreements.

2.      After several months, GLNH stopped reimbursing Xavier, leaving Xavier having spent $715,659.50 in unreimbursed Tenant Improvements to the Premises. Work halted due to GLNH's failure to reimburse Tenant Improvements. GLNH and Xavier negotiated an apparent resolution conditioned on payment of the unreimbursed Tenant Improvements, but GLNH breached that agreement too. The Third Floor remains a construction zone which Xavier has never been able to occupy. It has instead been relegated to the 5th Floor temporary space.

3.      On January 22, 2024, GLNH purported to convey the Property to the Debtor[1] by special warranty deed.

4.      Just 15 days later, the Debtor filed for voluntary chapter 11 protection in this Court. [Docket No. 1]. Its only asset is the Property. [Docket No. 1].

5.      Despite the fact that there is no agreement or contract between Debtor and Xavier of any kind, Debtor has asserted a right in this proceeding to collect rent under the Lease between GLNH and Xavier.[2] Debtor ignores the material breach of the Lease and the fact that Xavier has never been able to occupy the Premises specified in the Lease due to that material breach and

---

[1]     Although GLNH is listed as a creditor by the Debtor, GLNH and the Debtor share the same singular owner—Ali Chourdri. Ali Choudri is also listed as a creditor of the Debtor—Choudri, on behalf of the Debtor, signed a "Deed of Trust & Security Agreement" as repayment on a promissory note held by Choudri. This Deed was recorded to the Harris County Clerk's Office just two hours before this petition was filed. *See* Deed of Trust & Security Agreement, RP-2024-40738, Harris County, Texas (filed Feb. 6, 2024).

[2]     While Debtor purports to act as Landlord pursuant to the Lease, it has not shown any specific authorization to do so. Debtor's relationship to the Lease is unclear.

contends that it is entitled to approximately $2 million dollars in past due rent from Xavier, post offset of the unpaid Tenant Improvement. [Docket No. 176, pg. 24].

6.      Following the bankruptcy petition, the principal for the Debtor and GLNH, Ali Choudhri, sought to confer offered Xavier an "opportunity" to become an equity owner under the unconfirmed Plan presented in this proceeding. Xavier considered the offer, but ultimately did not agree.

7.      Immediately after Xavier indicated it was not interested in Debtor's rent-to-equity offer, Debtor retaliated by locking out Xavier from the premises without prior warning or advance notice. The Debtor did so knowing full well it owes Xavier more than $700,000 in unreimbursed tenant improvements, and much more in other improvements and maintenance conducted, more than offsetting the rent to which GLNH or debtor would be entitled. This does not include the damages owed to Xavier for GLNH/the Debtor's breaches of the Lease. Debtor timed the lockout knowing full well the likely effect its decision, particularly without warning or advance notice, would have on the school, its staff, and its students. Importantly, Debtor chose to do so the day before Xavier's publicly announced graduation for the 2024 class[3] with full knowledge and intent of the impact this would have on the graduation ceremony. Due to the Debtor's improper actions:

(a)      Xavier is prevented from accessing the diplomas for tomorrow's graduation (fortunately being held at another location).

(b)      Xavier is prevented from accessing student files with confidential information, including information subject to Family Educational Rights and Privacy Act ("FERPA") and notes from private counseling sessions subject to heightened protections under HIPAA. These include psycho-educational testing, medical records, and even some of the student's medicines.[4]

---

[3]      https://www.xavieracademy.org/

[4]      Given the history of third parties gaining access to the building, Xavier is concerned that this also may potentially expose these student files and notes private counseling sessions to access to third parties. Furthermore, Debtor

(c)     Xavier is prevented from accessing any of its computers, furniture, desks, chairs, and books in the premises as well as its financial records and invoices which impact Xavier's day to day operations. This essentially prevents Xavier from operating as a school. Xavier has summer school students scheduled to start on the morning of Monday, June 3, 2024. These include both current Xavier students as well as students from other schools that are attending Xavier in order to fulfill track so they can start the next grade level on track in August.

(d)     May cause the death of the live fish that are used in Xavier's aquaponics program which must be fed on a regular basis.

(e)     Xavier's teachers are prevented from accessing their personal property at Xavier.

(f)     Xavier is prevented from sending final records to colleges and universities to which they have applied.

8.     As a result, Debtor's conduct, if emergency relief is not granted, will cause irreparable harm to Xavier and its students.

9.     Accordingly, Xavier requests this Court issue an emergency order directing the Debtor to allow Xavier Academy access to the premises for a period of fourteen days.

10.     Moreover, Xavier brings this adversary proceeding because of the Debtor (and Galleria Loop Note Holder, LLC) can be held accountable for their conduct.

## II.
## EMERGENCY CONSIDERATION

11.     Xavier Academy requests the Court consider Xavier's Request for Temporary Restraining Order as early as possible, especially given that graduation is tomorrow. Xavier Academy would need to access the premises today, or tomorrow morning at the earliest, to ensure the graduating class is not affected by the improper lockout. Moreover, Xavier Academy would

---

removed the cameras present which deprive Xavier from any ability to monitor the Premises for unauthorized access.

need access for Monday forward to ensure certain students' summer school is not disrupted, causing potential delay in their education.

## III.
## JURISDICTION AND VENUE

12.     The Debtors file this adversary under Fed. R. Bank. P. 7001(7) to obtain an injunction pursuant to Fed. R. Bank. P. 7065, 11 U.S.C. § 105, and 11 U.S.C. § 362.

13.     This Court has jurisdiction over this matter under 28 U.S.C. § 1334 as this proceeding takes place in and is related to the above-named chapter 11 case under title 11 of the United States Code (the "Bankruptcy Code").

14.     Venue is proper under 28 U.S.C. § 1409. This is a core proceeding pursuant to 28 U.S.C. § 157.

## IV.
## PARTIES

15.     Plaintiff Xavier Educational Academy, LLC ("Xavier"), is a limited liability company, duly formed and existing under the laws of the State of Texas, with its principal place of business in the State of Texas.

16.     Defendant 1001 WL, LLC (the "Debtor") is a limited liability company, duly formed and existing under the laws of the State of Texas.

17.     Defendant Galleria Loop Note Holder, LLC ("Landlord") is a limited liability company, duly formed and existing under the laws of the State of Texas, that may be served with citation in this action on its registered agent, Registered Agents Inc., at 5900 Balcones Dr., Suite 100, Austin, TX 78731, or wherever it may be found.

# V.
## STATEMENT OF FACTS

**A.    The Lease**

18.    On or about May 7, 2021, Xavier entered a 15-year Lease Agreement with Landlord to lease the Third Floor of 1001 West Loop South, Houston, Texas. The Lease Term was defined to begin on the Commencement Date:

> (d) **"Lease Term":** a period of One Hundred Eighty (180) months, commencing on the Commencement Date (as defined below), plus any lease extensions or renewals as outlined herein ("Term").

Lease § 1(d), at 4.

19.    The Commencement Date was defined as follows:

> (g) "**Commencement Date**": The lease shall commence the earlier of (a) *Two Hundred-Forty (240) days after lease execution* (the "Commencement Date") or (b) the date the Tenant moves into the space following substantial completion of the Tenant Improvements under Exhibit D of this Lease. *The Two Hundred-Forty (240) day period above shall be extended day-for-day for each day on which an Excused Delay occurs.* "Excused Delay" means: (i) if Landlord has not delivered possession of the entire Premises within three (3) days after date of this Lease, each day thereafter until such possession is delivered; (ii) *delays in Tenant's performance of the Leasehold Improvements attributable to or arising out of delays caused by force majeure events* or by Landlord or Landlord's representative, including, but not limited to, interference, restricting access to the Premises, interruptions or unavailability of electricity or other Building services, unavailability of the Building freight elevator *or the failure by landlord to respond to requests for approval in accordance with Exhibit D hereto*.

Lease § 1(g), at 5.

20.    Exhibit D to the Lease (the "Leasehold Improvements Agreement"), attached to and incorporated into the Lease by reference, gave Tenant the right to design and construct leasehold improvements, the plans of which were approved by Landlord, with Landlord to reimburse such costs within 10 days of the improvements:

1. **Premises Condition and Tenant Improvements**. Tenant shall have the right to design and construct leasehold improvements to the Premises ("Tenant's Improvements") in accordance with its plans and specifications which Tenant shall deliver to Landlord in form suitable for permit application (collectively, the "Working Drawings"). Working Drawings, and all material changes thereto, shall be subject to Landlord's written approval, which shall not be unreasonably conditioned or withheld and shall be approved or denied in writing within five (5) business days after Tenant submits them. If Landlord denies its approval, it shall specify the reasons for doing so in detail. Landlord's review and consideration of the Working Drawings, and any changes thereto, shall be limited to matters affecting the structure of the Building and mechanical, electrical and other Building systems. ***Landlord shall provide Tenant with a cash allowance of $55.00 per rentable square foot of the Premises for all hard and soft costs incurred by Tenant in preparing the Premises for Tenant's occupancy***, including the Tenant's Improvements. Tenant shall be liable for all excess construction costs. Tenant shall complete the Tenant's Improvements at Tenant's sole risk, cost and expense (subject, however to reimbursement of Tenant's Improvements Costs set forth below). Construction shall be performed in a good and workmanlike manner and in compliance with all applicable rules, laws, codes and regulations. ***Such allowance will be paid by Landlord to Tenant within ten (10) days following substantial completion of the Tenant's Improvements*** or, at Tenant's election, in progress payments as the Tenant Improvements are being performed; and if such payment is not received in full within such time period, then ***Tenant will be entitled to offset such amount against rent or any other payments becoming due under this Lease***.

Lease at 39.

21.     As a result, although the Lease was executed on May 7, 2021, the lease term began on the Commencement Date, to be extended day-for-day for each day on which an Excused Delay occurs, defined to include both "delays in Tenant's performance of the Leasehold Improvements attributable to or arising out of delays caused by force majeure events" and "failure by landlord to respond to requests for approval in accordance with Exhibit D hereto" meaning the attached Leasehold Improvements Agreement.

22.     GLNH (as described below) failed to comply with the Leasehold Improvements Agreement by not reimbursing Xavier's Tenant Improvements. Consequently, the third floor remains unfinished, Xavier has never taken occupancy, and the Lease has never commenced.

**B.      Short Term Occupancy Agreements**

23.     Xavier entered a series of Short Term Occupancy Agreements which gave it access to "as is" temporary space which it could use to operate on a short term basis while the Tenant Improvements were completed. These Short Term Occupancy Agreements were based on the Fifth Floor of the Premises.

24.     On May 24, 2021, Xavier and GLNH also entered a Short Term Occupancy Agreement for "as is" temporary space at 1001 West Loop South, Houston, Texas for August, September, and October 2021 at monthly rent of $10,500 per month.

25.     On June 28, 2021, Xavier and GLNH also entered another Short Term Occupancy Agreement for additional "as is" temporary space on the Fifth Floor at 1001 West Loop South, Houston, Texas for August, September, and October 2021 at an average monthly rent of $16,500 per month.

26.     On August 16, 2021, Xavier and GLNH entered an "Third Amendment to Short Term Occupancy Agreement" amending the terms of the prior short term Occupancy Agreements for the "as is" temporary space at 1001 West Loop South, Houston, Texas for an additional four months through December 31, 2021 at an average monthly rent of $21,000 per month.

27.     On September 3, 2021, Xavier and GLNH entered an "Fourth Amended Letter Agreement" amending the terms of the prior Short Term Occupancy Agreements for the "as is" temporary space at 1001 West Loop South, Houston, Texas for an additional four months through December 31, 2021, with additional space at an average monthly rental rate of $3,050.00

28.     On December 17, 2021, Xavier and GLNH entered a "Fifth Amended Letter Agreement" amending the terms of the prior Short Term Occupancy Agreements for the "as is" temporary space consisting of Suites 500, 500A, 525, and 575 at 1001 West Loop South, Houston, Texas for an additional three months through March 31, 2022 at an average monthly rent of $24,050.00 per month. This was the final amendment to the letter agreements.

29.     Xavier paid the rent as agreed pursuant to these letter agreements and the various amendments. Following the expiration of these agreements, Xavier has continued to occupy only the temporary space on the 5th floor and asserted right of offset based on the unreimbursed Tenant Improvements that began accruing on November 1, 2021 and remain outstanding to this day.

## C.     Xavier's Tenant Improvements

30.     As Landlord was well aware, Xavier intended to make major and substantial Tenant Improvements to the Third Floor of the Premises to make it suitable for Xavier's school environment.

31.     Xavier worked with the same architect and firm, CDI Douglass Pye, Inc. ("CDI" or "Architect"), that designed the Building at 1001 West Loop South and had previously worked with GLNH and its affiliated real estate management company, Jetall. GLNH approved Tenant's Improvements and Working Drawings and work proceeded with Xavier's representatives submitting Draw Requests, as instructed, and Landlord reimbursing those amounts pursuant to the Lease.

32.     Xavier held regular meetings with representatives of Architect and representatives of GLNH , including Jetall employees Michael Chang, Holly Borham, and Annette Hollingsworth, regarding the plans, progress, and status of the Tenant Improvements.

33.     At one point, Xavier encountered unexpected delays in the permitting process with the City of Houston as well as delays caused by supply chain disruptions (including essential

supplies such as the DOAS-1 air handler that is required for schools). Xavier's representatives diligently overcame the permitting issues and delays.

34.     In November 2021, Landlord stopped reimbursing Xavier's Tenant Improvement Draw Requests without warning or explanation. A summary of the status of the Draw Requests is as follows:

| Invoice | Date | Amount | Paid by Landlord | Balance Owed | Services |
|---------|------|--------|------------------|--------------|----------|
| Draw Request 1 | 8/16/2021 | $21,147.21 | $21,147.21 | -- | CDI |
| Draw Request 2 | 9/28/2021 | $42,921.85 | $42,921.85 | -- | COH Water/Waste Water Fee |
| Draw Request 3 | 9/29/2021 | $62,874.00 | $62,874.00 | -- | Ruppel Construction |
| Draw Request 4 | 11/1/2021 | $292,905.00 | $140,000.00 | $152,905.00 | Ruppel Construction |
| Draw Request 5 | 12/2/2021 | $136,719.50 | $0.00 | $136,719.50 | Ruppel Construction / CDI |
| Draw Request 6 | 2/25/2022 | $426,035.00 | $0.00 | $426,035.00 | Ruppel Construction / RCCRE |
| **Total** | | **$982,602.56** | **$266,943.06** | **$715,659.50** | |

35.     Xavier has never been provided a cogent explanation for why GLNH continues to fail to reimburse Tenant's Improvements. GLNH has variously represented that the Tenant's Improvements would be paid and at other times that GLNH's lender had prevented GLNH from making the payments.

**D.     GLNH's Improper Attempt to Terminate the Lease**

36.     On March 25, 2022, GLNH purported to terminate the Lease despite its own prior material breach and the significant unreimbursed Tenant Improvements that Xavier had made.

37.     On March 30, 2022, Xavier responded, pointing out that both GLNH's prior material breach and the right of offset under the Lease ensured that Xavier did not owe any rent and would not owe any rent for quite some time due to GLNH's failure to reimburse Xavier's Tenant Improvements. The parties then began what Xavier believed were productive negotiations on how to resolve the dispute.

**E. Landlord Breaches the Negotiated Resolution**

38.     Over the next month, Xavier and GLNH engaged in extensive negotiations on a resolution to the impasse and appeared to reach a resolution in the form of a new letter agreement (the "Negotiated Letter Agreement") on April 22, 2022. The Negotiated Letter Agreement would alter the terms of and expanded the area in the Lease—removing the excused delay clause while adding the entire fifth floor of the Premises. However, it was expressly conditioned, as a condition precedent to the effectiveness of the agreements subject to the negotiated resolution, on GLNH's payment of a portion of the outstanding Tenant Improvement draw requests. GLNH was to pay $309,309.50 to Xavier on or before July 1, 2022 in order for the agreements to be effective.

39.     As it had done in the past, GLNH once again failed to pay this amount or make any payments on the unreimbursed Tenant Improvement amounts Xavier had expended on the Premises, leaving the parties back where they started.

**F. Additional Repairs Required by Xavier**

40.     Xavier has never been able to occupy the Premises due to the stalled build-out and the condition of the Property has deteriorated significantly. For example, the air conditioning unit at the Property has been out since March 2024, requiring stop-gap measures which only partially cool the Property; the Property has only one operational elevator that works sporadically and has stopped running with people trapped inside; cleaning crews have quit for lack of cleaning supplies and nonpayment. Although the Parties continued strained negotiations, these efforts have been further exacerbated by a lender's attempted foreclosure of the Property in November 2023.

**G. Post-Petition Conduct and Lockout**

41.     Following the purported transfer of the premises to the Debtor, on May 9th, 2024, the Debtor, through its principal Ali Choudhri, approached Xavier regarding the alleged rental payments due. Mr. Choudhri suggested Xavier becoming an owner of a floor as part of a coop or

condominium Mr. Choudhri was arranging as part of the Chapter 11 Plan in this proceeding. Mr. Choudhri specifically stated that for the same amount of rent that would have been paid over the course of the lease, Xavier would become owner of the same floor it had been occupying.[5]

42.     Xavier ultimately did not agree to Mr. Choudhri's proposals and informed Mr. Choudhri on May 28, 2024 when Mr. Choudhri called asking to follow up. After Xavier said it was not interested in the proposal, Mr. Choudhri promised retaliation.

43.     The following day (today), the Debtor, without warning, locked out Xavier from the Premises.

## VI.
## CAUSES OF ACTION

### A.     Breach of Contract

44.     The Lease is a valid and enforceable written contract between Xavier and GLNH. Xavier, as the tenant under the Lease, is a proper party.

45.     Xavier has an enforceable right to reimbursement of Tenant Improvements under the terms of the Lease.

46.     GLNH committed a material breach of the Lease by failing to reimburse Tenant Improvements when due.

47.     Xavier has performed and was excused from further performance by GLNH's prior material breach of the Lease by failing to reimburse Tenant Improvements.

48.     As a result of GLNH's breach of the Lease, Xavier has suffered injury by being deprived of its contractually bargained for right of timely reimbursement of Tenant Improvements, including the loss of at least $715,659.50 in unreimbursed Tenant Improvements and additional

---

[5]     *See* **Exhibit A, Declaration of Richard de la Cuadra**

damages due to the costs of delay in being able to occupy the space for which it bargained which would allow it to continue to grow its school.

49.     Xavier has been injured by being wholly deprived of the bargained reimbursements specified in the Lease. Xavier seeks the reimbursements it is due under the Lease. Xavier also seeks consequential damages, including but not limited to, lost profits, cost of a substitute location, and incidental expenses.

50.     To the extent Debtor has the legal right to enforce the Lease on its own account, as it purports to do in this proceeding, it steps into the shoes of GLNH as Landlord and is subject to the same defenses.

51.     Xavier also seeks its damages for the Debtor/GLNH's breach of the Lease through the retaliatory lockout.

**B.      Quantum Meruit**

52.     In the alternative, to extent Xavier's breach of contract claim is not enforceable against one or both putative Landlord's, Xavier is entitled to recovery under the doctrine of quantum meruit/unjust enrichment.

53.     Xavier provided a benefit to the Debtor/GLNH by improving the Premises which has gone unreimbursed. The Debtor/GLNH obtained a benefit when it accepted these improvements. Xavier is entitled to a return of all fees expended, whether directly or indirectly, in improvement of the Premises.

**C.      Attorney Fees**

54.     Xavier seeks reasonable and necessary attorney's fees and costs under Chapter 38 of the Texas Civil Practice and Remedies Code because this suit is for breach of a written contract necessitated by Landlord's refusal to perform under the Lease.

# VII.
## CONDITIONS PRECEDENT

55.     All conditions precedent to Xavier's right to recover from Landlord have occurred, have been executed, have been performed, or are waived.

# VIII.
## REQUEST FOR TEMPORARY RESTRAINING ORDER AND WRIT OF REENTRY

### A.     Restraining Order

56.     Xavier requests an Ex-Parte Temporary Restraining Order (the "TRO") pursuant to Fed. R. Bank. P. 7065 and Fed. R. Civ. P. 65.

57.     Richard de la Cuadra, Xavier's founder and head of schools, has set forth the basis for the TRO in the attached declaration.

58.     Xavier is seeking a TRO to require the Debtor to allow access to the Premises. Xavier is likely to suffer irreparable harm if a TRO is not issued. Xavier is willing to post bond pursuant to Fed. R. Civ. P. 65(c).

59.     Preliminary injunctive relief is proper where, as here, the movant shows (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

60.     The Fifth Circuit has discussed the sliding scale in evaluating both likelihood of success related to the likelihood of irreparable harm and finding that the greater likelihood of one resulted in less being required in the other. Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 576–77 (5th Cir. 1974). The Fifth Circuit, in *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.,* also stated that irreparable harm was a harm "for which there is no adequate remedy at law." 710 F.3d 579, 585 (5th Cir. 2013). An adequate remedy at law can be as simple as monetary damages, but the availability of such monetary damages may not be an adequate

remedy at law. *Lee v. Bickell*, 292 U.S. 415, 54 S.Ct. 727, 78 L.Ed. 1337 (1934); *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

61.     The Debtor's retaliatory lockout of Xavier from the Premises threatens irreparable harm to both Xavier's reputation and to its students. Moreover, the Debtor/GLNH's liability to Xavier is clear. The equities favor Xavier maintaining possession of the Premises until this dispute may be resolved.

**i.     Xavier is likely to succeed on the merits.**

62.     Xavier is likely to succeed on the merits on its breach of contract and quantum meruit/unjust enrichment claims.

63.     Xavier is entitled to $715,659.50 in unreimbursed tenant improvements. Xavier never occupied the third floor of the Premises because the Lease never commenced given GLNH's failures to reimburse the Tenant Improvements. Instead, Xavier occupied the fifth floor through various Short Term Occupancy Agreements. Xavier paid the rents due under these Short Term Occupancy Agreements until becoming a hold over tenant on April 1, 2022. At the time, Xavier was paying $24,050 a month. From April 1, 2022 until May 31, 2024, the total rent due would be $601,250.[6] This is still ***$100,000*** less than the amount due to Xavier. This is exclusive of all the other maintenance and improvement costs Xavier has had to bear and the damages for having to find a substitute location given GLNH's breaches.

64.     There is no reasonable dispute—Xavier provided Tenant Improvements benefitting the Debtor/GLNH. The Debtor/GLNH is contractually required to reimburse Xavier for these Tenant Improvements. To date, they have failed to fully compensate Xavier. This factor weighs in favor of a temporary restraining order.

---

[6] There are 25 months from April 2022 through May 2024.

**ii.** **Xavier (and its students) will likely suffer irreparable harm without an injunction.**

65.    More importantly, Xavier and its students will likely suffer irreparable harm without an injunction.

66.    The Debtor/GLNH have locked out Xavier and its staff ***the day before graduation***. Xavier has no access to the diplomas for its graduates to hand out tomorrow. No monetary compensation could compensate the children for their hard work going unrecognized at graduation.[7]

67.    Additionally, Xavier will be prevented from operating should it continue to be locked out. This essentially prevents Xavier from operating as a school. Xavier has summer school students scheduled to start on the morning of Monday, June 3, 2024. These include both current Xavier students as well as students from other schools that are attending Xavier in order to fulfill track so they can start the next grade level on track in August. Xavier will also be prevented from sending final records to colleges and universities which the students have applied to. While the lost income can be cured through monetary means, since Xavier is an educational academy, the harm done to its students will be irreparable.

68.    Moreover, a continued lockout could lead to potential violation of other federal laws. For example, Xavier has confidential student files, including information subject to the Family Educational Rights and Privacy Act ("FERPA") and HIPPA. These include psycho-educational testing, medical records, and even some student's medicines. Given the prior interactions with the Debtor/GLNH, Xavier is concerned unauthorized third parties may gain access to these student files and confidential information.

---

[7]    Fortunately, graduation is being held at an off-site location but Xavier is still unable to access the students' diplomas that had been prepared for the occasion.

69.     Finally, Xavier will suffer reputational injury if it is not allowed to operate or otherwise continue to be locked out. Reputational injury can be used as a basis for a temporary restraining order if it is "not merely speculative." *Pruvit Ventures, Inc. v. Forevergreen Int'l LLC*, No. 4:15-CV-571-ALM-CAN, 2015 WL 9876952, at *5 (E.D. Tex. Dec. 23, 2015), *report and recommendation adopted*, No. 4:15-CV-571, 2016 WL 231160 (E.D. Tex. Jan. 19, 2016).

70.     Given the irreparable harm Xavier and its students will suffer if Xavier does not regain access, this factor favors an injunction.

### iii.    The equities favor Xavier.

71.     The Court must "exercise discretion to determine whether the movant's . . . harm is not outweighed or equal to that of the [Debtor's] and, if so, then a preliminary injunction may be issued." *In re OGA Charters, LLC*, 554 B.R. 415, 425–26 (Bankr. S.D. Tex. 2016). The Debtor/GLNH's only alleged injury is monetary loss. Xavier has demonstrated the much more serious injury to its reputation and to its students education. The equities clearly favor Xavier, weighing in favor of a temporary restraining order.

### iv.    The public interest factor is neutral.

72.     There is a public interest in the Debtor/GLNH retrieving unpaid rent (if due). Equally, there is a pedagogical interest in Xavier maintaining to operate and a general public interest in students being able to graduate (and have their records forwarded to their respective colleges/universities). As such, this factor is neutral.

## B.    Writ of Reentry

73.     Additionally and separately, Texas Property Code § 93.003 allows a tenant to recover possession of a premises after lock out by filing a sworn complaint for reentry, specifying the facts of the alleged unlawful lockout by the landlord or the landlord's agent. The tenant must state under oath the alleged unlawful conduct.

74.     Xavier attached the declaration of Richard de la Cuadra satisfying these requirements. Xavier requests the Court issue a writ of reentry until a final hearing can be held regarding Xavier's right of possession.

## IX.
## CONCLUSION

Xavier requests that the Court grant its request for a temporary restraining order, and ultimately, find in favor of Xavier against Defendants.

Dated: May 29, 2024

_/s/ Genevieve M. Graham_
**JACKSON WALKER LLP**
Luke J. Gilman (TX Bar No. 24074279)
(pro hac vice pending)
Genevieve M. Graham (TX Bar No. 24085340)
Javier Gonzalez (TX Bar No. 24119697)
(pro hac vice pending)
1401 McKinney Street, Suite 1900
Houston, TX 77010
Telephone: (713) 752-4200
Facsimile: (713) 752-4221
Email: lgilman@jw.com
Email: ggraham@jw.com
Email: jgonzalez@jw.com

_Counsel to Xavier Educational Academy, LLC_

# Exhibit A

## Declaration

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| 1001 WL, LLC | § | |
| | § | Case No. 24-10119-SMR |
| _____Debtor._____ | § | |
| | § | |
| XAVIER EDUCATIONAL ACADEMY, LLC, | § | |
| | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Adversary No. _____ |
| | § | |
| 1001 WL, LLC and GALLERIA LOOP NOTE HOLDER, LLC, | § | |
| | § | |
| | § | |
| Defendants. | § | |
| | § | |

## DECLARATION OF RICHARD DE LA CUADRA
## IN SUPPORT OF REQUEST FOR PRELIMINARY INJUNCTION

I, Richard de la Cuadra, declare under penalty of perjury:

1.      I am the founder and head of school for Xavier Educational Academy ("Xavier"), located at 1001 West Loop South, Houston, Texas. The statements made herein are asserted to the best of my personal knowledge.

2.      Xavier is a college preparatory school in Houston catering to middle and high school students. Xavier is committed to ensuring that every student who walks through our doors receives a transformative educational experience that helps them realize their full potential. Xavier's commitment to providing quality education has remained unrelenting, and it continues to strive to create an inclusive and welcoming environment for its students.

3. On or about May 7, 2021, Xavier and Galleria Loop Note Holder, LLC ("GLNH" and "Landlord") entered into a Lease Agreement (the "Lease") for real property located at 1001 West Loop South, Houston, Texas (the "Premises"). The Premises was meant to be used as a campus for Xavier in the Galleria area of Houston, Texas.

4. The Premises (specifically the third floor) was not built out at the time the Lease was executed. Xavier desired, and contracted for, the ability to improve the third floor to maximize the use of the space and cater it to Xavier's specifications and educational use. As such, as part of the Lease, GLNH agreed to reimburse Xavier for amounts Xavier spent on leasehold improvements to the Premises defined as "Tenant Improvements" under the Lease. Consistent with the Lease terms, Xavier began making substantial Tenant Improvements on August 16, 2021.

5. Importantly, although the Lease was entered into on or about May 7, 2021, the lease term began on the Commencement Date, to be extended day-for-day for each day on which an Excused Delay occurs, defined to include both "delays in Tenant's performance of the Leasehold Improvements attributable to or arising out of delays caused by force majeure events" and "failure by landlord to respond to requests for approval in accordance with Exhibit D hereto" meaning the attached Leasehold Improvements Agreement.

6. Not wanting to be without a useable space during the buildout of the Tenant Improvements, Xavier entered into various Short Term Occupancy Agreements (and subsequent amendments) for use of the fifth floor of the premises. While the Short Term Occupancy Agreements were altered several times, in relevant part, the latest Short Term Occupancy Agreement leased various portions of the fifth floor to Xavier from December 17, 2021 through March 31, 2022, for $20,050.00 per month.

7.     Xavier paid these (and all prior) rents under the Short Term Occupancy Agreements. Payments made by Xavier to GLNH include the following:

| Type | Num | Date | Amount | Memo |
|------|-----|------|--------|------|
| Check | ET | 04/23/21 | 46,062.50 | First Month Rent |
| Check | ET | 04/23/21 | 82,860.42 | Last Month Rent |
| Check | 6241 | 06/01/21 | 500.00 | Storage Rent Inv#... |
| Check | 6282 | 07/01/21 | 500.00 | July Storage rent I... |
| Check | 6309 | 08/02/21 | 15,000.00 | Inv# 18316 August |
| Check | 6317 | 08/06/21 | 1,000.00 | Inv# 18316 |
| Check | 6359 | 09/01/21 | 23,100.00 | Inv# 18390 |
| Check | 6373 | 09/07/21 | 2,345.00 | Sept Suite 550 |
| Check | 6399 | 10/01/21 | 24,050.00 | October Rent Inv# ... |
| Check | 6413 | 10/11/21 | 1,600.00 | Conference Room... |
| Check | 6439 | 10/28/21 | 1,800.00 | Rent Suite 550 |
| Check | 6431 | 11/01/21 | 24,050.00 | Inv# 18626 Nove... |
| Check | 6474 | 12/01/21 | 24,050.00 | Inv# 18805 Dece... |
| Check | 6483 | 12/02/21 | 800.00 | Conference room ... |
| Check | 6509 | 01/01/22 | 24,050.00 | Inv# 18926 January |
| Check | 6535 | 02/01/22 | 24,050.00 | Inv#      Feb |
| Check | 6577 | 03/01/22 | 24,050.00 | Inv# 19182 Mar |
| Check | 6626 | 03/30/22 | 200.00 | Conference room |
| Check | 6637 | 04/01/22 | 200.00 | Conference Room... |
| Check | 6657 | 04/13/22 | 400.00 | 550 Conference ro... |
| Total | | | 320,667.92 | |

8.     Nevertheless, after several months, GLNH stopped reimbursing Xavier for its Tenant Improvements.

9.     A breakdown of the improvements and draw requests are reproduced below:

| INVOICE | DATE | AMOUNT | PAID BY LANDLORD | BALANCE OWED | SERVICES |
|---------|------|--------|------------------|--------------|----------|
| Draw Request 1 | 8/16/2021 | $21,147.21 | $21,147.21 | -- | CDI |
| Draw Request 2 | 9/28/2021 | $42,921.85 | $42,921.85 | -- | COH Water/Waste Water Fee |
| Draw Request 3 | 9/29/2021 | $62,874.00 | $62,874.00 | -- | Ruppel Construction |
| Draw Request 4 | 11/1/2021 | $292,905.00 | $140,000.00 | $152,905.00 | Ruppel Construction |
| Draw Request 5 | 12/2/2021 | $136,719.50 | $0.00 | $136,719.50 | Ruppel Construction / CDI |
| Draw Request 6 | 2/25/2022 | $426,035.00 | $0.00 | $426,035.00 | Ruppel Construction / RCCRE |
| **Total** | | **$982,602.56** | **$266,943.06** | **$715,659.50** | |

In total, GLNH still owes Xavier $715,659.50 in unpaid Tenant Improvements.

10.     Xavier has never been able to occupy the Premises due to GLNH's failure to reimburse Tenant Improvements and the resulting stalled build-out. In the meantime, the condition of the Property has deteriorated significantly. Chunks of concrete have fallen from the ceiling of the garage. The air conditioning units have failed repeatedly. Additionally, unknown third parties have periodically gained access to the building, including to the Xavier space, bypassing the security precautions that were supposedly in place. The air conditioning units have failed repeatedly at the Property and have been out since March 2024, requiring temporary cooling measures that do not adequately cool the occupied space. The Property has experienced multiple problems with the elevators not working properly. People have even gotten trapped inside. The service elevator has not been operational for some time as well. Cleaning crews have quit for lack of cleaning supplies and nonpayment and Xavier has frequently had to buy its own toilet paper.

11.     My understanding is that some time in January 2024, GLNH purported to convey the Property to 1001 WL, LLC (the "Debtor"). I was not informed of this conveyance but was asked to begin redirecting rent payments to Debtor. Shortly thereafter, I learned that the Debtor had initiated voluntary bankruptcy proceedings in this Court.

12.     On or about May 9, 2024, Ali Choudri, who I understand is the owner of the Debtor and of GLNH, approached me regarding the alleged rental payments that Mr. Choudri believed Xavier owed and suggested Xavier become an owner of a floor as part of a coop or condominium Mr. Choudri was arranging as part of the Chapter 11 Plan in this proceeding. Mr. Choudri stated that for the same amount of rent that would have been paid over the course of the lease, Xavier would become owner of the same floor it had been occupying.

13.     Xavier ultimately determined that it was not interested in pursuing the opportunity Mr. Choudri had described and would prefer to stay in a lease instead of ownership. I informed

Mr. Choudhri of this on May 28, 2024 when Mr. Choudhri called asking to follow up. After I informed Mr. Choudhri that Xavier was not interested in the proposal, Mr. Choudhri became angry, entered a tirade, and promised retaliation. Mr. Choudri stated that he had been "nice" to me and Xavier but no longer be if Xavier rejected his proposal. He threatened that he would spend hundreds of thousands of dollars on litigation and discovery to make sure that he could prove that I had been speaking badly about him.

14.     After I informed Mr. Choudri that Xavier was not interested in the equity offer, a lockout notice was posted on the door of the 5th floor temporary space Xavier was occupying, a wall was constructed around the space to further prevent access, and the cameras that Xavier had installed to monitor the 5th floor temporary space were dismantled.

15.     As a result, Landlord's lockout poses a great risk of damaging Xavier's reputation and daily operations and it will certainly cause irreparable damage to Xavier's students. For example:

- Xavier is prevented from accessing the diplomas for tomorrow's graduation.

- Xavier is prevented from accessing student files with confidential information and notes from private counseling sessions. These include psycho-educational testing, medical records, and even some of the student's medicines. Given the history of third parties gaining access to the building, I am concerned that this also may potentially expose these student files and notes private counseling sessions to access to third parties, which we are no longer able to monitor due to the removal of the cameras.

- Xavier is prevented from accessing any of its computers, furniture, desks, chairs, and books in the premises as well as its financial records and invoices which impact Xavier's day to day operations. This essentially prevents Xavier from operating as a school.

- Xavier has summer school students scheduled to start on the morning of Monday, June 3, 2024. These include both current Xavier students as well as students from other schools that are attending Xavier in order to fulfill track so they can start the next grade level on track in August.

- Xavier no longer has access to the fish that are used in the aquaponics program which must be fed on a regular basis.

- Xavier's teachers are prevented from accessing their personal property at Xavier.

- Xavier is prevented from sending final records to colleges and universities to which students have applied.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: May 29, 2024

Richard de la Cuadra